The Bank of China, Japan and The Straits, Limited, Appellant, v. William Horace Morse, Respondent.

1. Judgment — Foreign Court — Service of Process on Non-resident. No jurisdiction of a New York stockholder in an English corporation is acquired by service upon him in New York of process in an action in an English court to enforce calls for the amount unpaid on his stock, which will support a personal judgment against him by that court so as to have any force and effect in New York, either to bind him personally or his property therein.

2. Trial — Questions of Law. Questions as to what the law of a foreign country is, where they depend upon the construction and effect of statutes or judicial opinions, are questions of law and not of fact.

3. Pleading — Illegality of Call — Lex Fori. The illegality of a call for the amount unpaid on stock of an English corporation may be set up as a defense in an action brought in New York to recover the amount thereof.

4. Corporations — Reorganization under English Companies Act — Transfer of Uncalled Capital. Amounts unpaid on stock at the time of the liquidation of a corporation do not constitute a part of its "business and property" which may be transferred to a new company under section 161 of the English Companies Act of 1862.

5. Voluntary Winding up under English Companies Act — Continuance under Order of Court. That a voluntary winding up of a company under the English Companies Act was subject to the supervision of the court does not take the proceeding out of the operation of section 161

and make it a winding up by the court, where the petition sought for a continuance of a voluntary winding up subject to the supervision of the court as opposed to a winding up by the court upon the petition of creditors, and the order was that the voluntary winding up be continued subject to such supervision.

6. VALIDITY OF REORGANIZATION SCHEME. ' A scheme for the reorganization under the English Companies Act of a corporation being voluntarily wound up is invalid because of inequality of treatment of shareholders, where those who take stock in the new company are, on payment of a small amount on each share of its stock, to be relieved from the payment of the amount unpaid on their old shares, whereas the full amount unpaid on old shares of those refusing to come in is to be enforced, not for the benefit of the old company and its shareholders, but for the benefit of the new company composed of old shareholders taking stock in it.

7. SAME. Such scheme is unauthorized where it contemplates excessive calls upon dissenting stockholders producing an amount much greater than is necessary to pay all debts and liabilities of the old company and providing that the fund thus raised, instead of being applied to such purpose and the remainder divided among the shareholders, shall be paid over to the new company for its benefit and the benefit of its stockholders.

8. EVIDENCE — EXPERT TESTIMONY TO OVERCOME FOREIGN STATUTES AND DECISIONS. Testimony of experts as to the approval by the English courts of schemes for the reorganization under the English Companies Act of companies being voluntarily wound up, contemplating the transfer as part of its business of the right to call unpaid amounts on stock in exchange for shares in a new company cannot control the statutes and decisions of the English courts to the contrary.

9. ESTOPPEL OF STOCKHOLDER. A stockholder of the corporation sought to be reorganized is not estopped to set up in an action to enforce calls for unpaid stock, the illegality of the scheme adopted and sanctioned by the court because of failure to oppose it before it was sanctioned, where he knew absolutely nothing of it or that it was before the court until long after.

10. EXTRA-TERRITORIAL EFFECT OF ENGLISH JOINT STOCK COMPANIES ARRANGEMENT ACT — FOREIGN STOCKHOLDER. A scheme sanctioned by the court for the reorganization of a corporation under the English Joint Stock Companies Arrangement Act of 1870 is binding only on the person or property of stockholders in England, and will not be enforced by the New York courts against a New York stockholder personally.

11. COURTS — JURISDICTION OF FOREIGN STOCKHOLDER — IMPOSITION OF LIABILITY. Personal liability cannot, in proceedings for the voluntary winding up of a corporation under the English Companies Act, be imposed by the English courts upon a New York stockholder to pay calls upon his shares solely for the benefit of another company to which the interests of the old company have been transferred

with the sanction of the court under that act, in the absence of personal service upon him r his appearance in the winding-up proceedings.

12. Corporations.— Implied Contract of Stockholder — Transfer of Uncalled Capital. There is no implied contract on the part of a purchaser of stock in a corporation to become liable to pay calls upon his shares solely for the benefit of a new company to which the interests of the old company have been transferred under a scheme for reorganization under the English Companies Act.

13. Enforcement of Calls — Comity. Calls against a New York stockholder for unpaid amounts on stock of an English corporation will not be enforced by the New York courts on the ground of comity, where not necessary for the payment of debts, and the recovery thereof is solely for the benefit of a new corporation under an unequal and oppressive scheme of reorganization contemplating the transfer to the new company of the amounts unpaid on old stock as part of the former's business and property, to which such stockholder does not assent, and liability for which is based on a statute and not upon common-law principles, especially where the English decisions hold that such a scheme is invalid and that the statute does not make calls upon shareholders any part of the assets of the new company.

14. Appeal — Stipulation for Judgment Absolute — New Trial. An objection that a judgment should not have been reversed altogether, but should have been sustained as to part of a claim and judgment for a smaller amount given, cannot be made in the Court of Appeals after stipulation for judgment absolute in case no error was committed in granting a new trial, where the whole claim was treated by the appellant and passed upon below as a single claim, part of which was invalid, since on such an appeal the order of reversal must be affirmed if the record shows any error by the trial court calling therefor.

*Bank of China, etc.,* v. *Morse,* 44 App. Div. 435, affirmed.

(Argued October 14, 1901; decided November 1, 1901.)

Appeal from an order of the Appellate Division of the Supreme Court in the first judicial department, entered December 8, 1899, which reversed a judgment in favor of plaintiff entered upon a verdict directed by the court and an order denying a motion for a new trial and granted a new trial.

At the close of the plaintiff's evidence the defendant moved to dismiss the complaint upon numerous grounds stated in the record. That motion was denied. An exception was taken by him to its denial and " as to each ground of the motion, separately." After the evidence was closed he moved to dismiss the complaint, and that the court direct a verdict in his

favor.  He also asked to go the jury upon the whole case as well as upon certain specified questions of fact.  Both were refused, the defendant excepted, and the court thereupon directed a verdict for the plaintiff.  The defendant then moved for a new trial which was also denied and a proper exception taken.  Upon appeal to the Appellate Division it reversed the judgment of the trial court.  It also reversed the order of that court denying the defendant's motion for a new trial and awarded a new trial.  Thereupon the plaintiff appealed to this court, and stipulated for judgment absolute if the order granting a new trial was affirmed.  All the questions raised upon this appeal are presented by the defendant's exceptions taken on the trial and to the denial of his motions.

The nature of the action and the facts so far as material are stated in the opinion.

*Stephen H. Olin* for appellant.  This is an action on contract brought by the plaintiff to enforce the agreement of the defendant to pay the amount unpaid on his shares when called upon to do so.  (*Stoddard* v. *Lum*, 159 N. Y. 265; *Dayton* v. *Borst*, 31 N. Y. 435; 1 Morawetz on Corp. §§ 128, 159.)  The contract was made in England by the issue of the stock certificate, it was to be performed in England, since it was for the purpose of conferring membership in the English corporation, only to be exercised in England.  Therefore the contract is to be interpreted by English law.  (*Bank of C., J. & S.* v. *Morse*, 44 App. Div. 438; *R. M. S. Mines* v. *Brown*, 58 Fed. Rep. 644; *Hennessy* v. *Farrelly*, 13 Daly, 368; *C. S. Ry. Co.* v. *Gebhard*, 109 U. S. 537; *Molson's Bank* v. *Boardman*, 47 Hun, 135.)  A call, whether made by directors as provided in the contract of subscription, or by the court as the successor in this respect of the directors, unless directly attacked and set aside by appropriate judicial proceedings, is conclusive evidence of the necessity for making such call, and binds to that extent every stockholder without personal notice to him.  (*Semple* v. *Glenn*, 91 Ala. 245; *Hawkins* v. *Glenn*, 131 U. S. 319; *Glenn* v. *Liggett*, 135 U. S. 538;

*G. W. Tel. Co.* v. *Purdy*, 162 U. S. 329 ; *Whitman* v. *O. Nat. Bank*, 176 U. S. 559 ; *H. Nat. Bank*, v. *Farnum*, 176 U. S. 640 ; *Stevens* v. *Hein*, 37 App. Div. 542 ; *Howarth* v. *Lombard*, 175 Mass. 570 ; *M. F. Ins. Co.* v. *Phœnix F. Co.*, 108 Mich. 170 ; *Lehman* v. *Glenn*, 87 Ala. 618.) Foreign law is to be proved as facts ; the proof to be made as facts to the court and not to the jury. (*Bank of C., J. & S.* v. *Morse*, 44 App. Div. 435 ; *Whitehead* v. *Heidenheimer*, 57 App. Div. 596 ; Code Civ. Pro. § 942 ; *Hanley* v. *Donoghue*, 116 U. S. 1 ; 13 Am. & Eng. Ency. of Law [2d ed.], 1057 ; 1 Greenl. on Ev. § 486 ; Story on Conflict of Laws, § 638 ; *Chanoine* v. *Fowler*, 3 Wend. 177 ; *Whitford* v. *P. R. R. Co.*, 23 N. Y. 467 ; *Savage* v. *O'Neil*, 44 N. Y. 298 ; *Hynes* v. *McDermott*, 82 N. Y. 41 ; *Genet* v. *D. & H. C. Co.*, 163 N. Y. 177 ; *H. R. P. & P. Co.* v. *Warner*, 39 C. C. A. 452 ; *Molson's Bank* v. *Boardman*, 47 Hun, 142.) Assuming that the scheme of arrangement was invalid, it was, nevertheless, error to reverse the judgment altogether, since it rested in part on the twenty shilling call made by the directors. (*U. S. V. Co.* v. *Schlegel*, 143 N. Y. 537 ; *U. S. V. Co.* v. *Foehrenbach*, 148 N. Y. 58 ; Cook on Corp. § 187.) There was no error in denying the motion to dismiss the complaint and in denying the defendant's motion to direct a verdict. (*Stoddard* v. *Lum*, 159 N. Y. 265 ; *Dayton* v. *Borst*, 31 N. Y. 435 ; *G. W. Tel. Co.* v. *Purdy*, 162 U. S. 329 ; *Hawkins* v. *Glenn*, 131 U. S. 319 ; *Glenn* v. *Liggett*, 135 U. S. 538 ; *Sanger* v. *Upton*, 92 U. S. 56 ; 1 Morawetz on Corp. §§ 128, 159 ; Cook on Corp. §§ 52, 256.) The questions which the defendant proposed to submit to the jury were obviously questions for the court. (*Molson's Bank* v. *Boardman*, 47 Hun, 135 ; *Hennessy* v. *Farrelly*, 13 Daly, 468 ; *Hooper* v. *Morris*, 50 N. C. 130 ; *Hall* v. *Costello*, 48 N. H. 176 ; *Consequa* v. *Williams*, 1 Pet. 229 ; *Cecil Bank* v. *Barry*, 20 Md. 287 ; Story on Conflict of Laws, § 638 ; 1 Greenl. on Ev. 486.)

*Alexander Tison* for respondent. The scheme was null and void to impose a personal liability upon defendant in

respect of the calls unpaid on shares. (*Clinch* v. *Financial Corp.*, L. R. [5 Eq.] 450; *Blatchford* v. *Ross*, 54 Barb. 42; *Stanley's Case*, 4 De G., J. & S. 407; *In re S. & G. E. Co.*, L. R. [1 Ch.] 15.; *In re M. C. Assn.*, L. R. [12 Eq.] 504; *In re N. F. M. Co.*, Weekly Notes [1889], 123; *Griffith* v. *Paget*, L. R. [5 Ch. Div.] 1894; *Simpson* v. *Palace Theatre*, 69 Law Times, 70; *Higgs Case*, 2 H. & M. 651.) The English Companies Acts are not ex-territorial and bind only in the jurisdiction. (*N. Z. L., etc., Co.* v. *Morrison*, L. R. [App. Cas. 1898] 349.) By the mere fact of taking shares in an English company, shareholders do not consent to be bound by every scheme that may thereafter be agreed to by a statutory majority. (*Paine* v. *Cork Co.*, 69 L. J. Ch. 156; *Anderson* v. *Haddon*, 33 Hun, 435; *Matter of Peveril Gold Mines*, 67 L. J. Ch. 77; *Matter of Baring-Gould*, 68 L. J. Ch. 429; *Platt* v. *Lott*, 17 N. Y. 478; *Lyall* v. *Edwards*, 6 H. & N. 337; *Decker* v. *Furniss*, 14 N.Y. 615; *Kelley* v. *Upton*, 5 Duer, 340.) The true effect of a scheme and the only power contemplated or conceded to it under section 161 of the act of 1870, is to dispose legally of the *res* of the company within the jurisdiction, and that is adequate to secure every object intended by the statute. (*Nicholl* v. *Eberhardt Co.*, 59 L. T. [N. S.] 860.; *Imp. Bank of China* v. *Bank of Hindustan*, L. R. [6 Eq.] 91; *Durant* v. *Abendroth*, 97 N. Y. 132; *Freeman* v. *Alderson*, 119 U. S. 185.) Even if the English court attempted to impose a personal liability not resting in express contract, defendant is not bound in our courts to such liability by proceedings in an English court where he was not a party. (*Marshall* v. *Sherman*, 148 N. Y. 9; *De Brimont* v. *Penniman*, 10 Blatchf. 436; *Webb* v. *Buckelew*, 82 N. Y. 555; *Anderson* v. *Haddon*, 33 Hun, 435; *Howarth* v. *Angle*, 162 N. Y. 179.) It is a good defense to an action for a call that the call was made for an illegal or unwarranted purpose. (Lindley on Law of Companies [5th ed.], 409, 411; 1 Morawetz on Priv. Corp. §§ 145, 150, 279; Green's Brice's Ultra Vires, 133, 151; *Livingston* v. *Lynch*, 4 Johns. Ch. 573; *H. & N. H. R. R. Co.* v. *Croswell*, 5

Hill, 383; *Ashton v. Burbank*, 2 Dillon, 435; *Middlesex Turnpike Corp.* v. *Locke*, 8 Mass. 268; *K. R. R. Co.* v. *Marsh*, 17 Wis. 13; *E. A. Rys. Co.* v. *E. C. Ry. Co.*, 11 C. B. 775; *Graham* v. *B., etc., Ry. Co.*, 2 M. & G. 146.) As a sale from the plaintiff to the new company this transaction was void on common-law principles, even if not contrary to statute. (*Stokes* v. *Phelps Mission*, 47 Hun, 570.) Defendant was entitled to the dismissal of the complaint and the direction of a verdict. (*Ex parte Mott & Turner*, 31 L. T. [N. S.] 773.) It is too late for plaintiff now to ask to recover the twenty shillings call alleged to have been made. (*Caswell* v. *Hazard*, 121 N. Y. 484; *Cobb* v. *Hatfield*, 46 N. Y. 533; *Godfrey* v. *Moser*, 66 N. Y. 250; *Gray* v. *Bd. of Suprs.*, 93 N. Y. 603; *Lake* v. *Nathans*, 67 N. Y. 589; *Mackay* v. *Lewis*, 73 N. Y. 382; *Simar* v. *Canaday*, 53 N. Y. 298; Code Civ. Pro. § 194.) Defendant was entitled to go to the jury upon the questions of fact in the case. (*Dyer* v. *Smith*, 12 Conn. 384; *Klein* v. *Baker*, 99 Mass. 283.)

MARTIN, J. This action was to enforce a claim against the defendant as a shareholder of the plaintiff company under an alleged scheme or agreement for winding up the plaintiff and transferring its property and business to another company. The plaintiff seeks to recover a personal judgment against the defendant as the holder of six hundred and eighty-five shares in the plaintiff company for the whole amount unpaid thereon for the benefit of a new corporation in which he has no interest. The plaintiff has retired from business, is being voluntarily wound up, and all its creditors have been paid. A new company was organized which has taken to itself the business and property of the plaintiff. It claims to have thereby acquired the right to enforce payment of calls against the defendant and other shareholders to the full amount unpaid on their shares, or rather to indirectly enforce such payment through an action by the plaintiff, a recovery in which would alone benefit the new corporation and its stockholders.

The plaintiff is an English company and on December 6, 1889, was incorporated by virtue of the English Companies Act under the name of the "Trust and Loan Company of China, Japan and the Straits, Limited." Its main office was in London, but it had branches and agencies in China, Japan, India and other eastern countries. The plaintiff was not organized to do banking, but to loan money, make advances on mortgages and other securities, and to do a general trust and agency business. The plaintiff's memorandum of association seems to contain no provision authorizing it to do a banking business. At first it did not attempt it, and until 1891 did not even post in its office the notice required of all English banks under the Companies Act. Its original capital was one million pounds, divided into 99,875 ordinary shares of ten pounds each, of which one pound five shillings was paid, and 1,250 founders' shares of one pound each which were fully paid up. In February, 1891, it declared a dividend of sixteen per cent on ordinary shares and eight hundred per cent on founders' shares, besides carrying fifty-five thousand pounds to its reserve fund. At the same time it voted to increase its capital to two million pounds by issuing one hundred thousand additional shares of ten pounds each on which one pound five shillings was to be paid up, and to change its name to its present title. At that time it was stated that the business of the company would continue on its former lines. At the end of the second year the company reported a surplus of 223,629 pounds, besides its paid-up capital, and a dividend of eight per cent on the ordinary shares was declared February 29, 1892. In January, 1893, in the report of the company it was announced that it had lost its entire reserve fund and a part of its capital. In September, 1893, the plaintiff's directors sent out a call of twenty shillings per share, stating in their notices that it was made in consequence of the company having arranged to do general exchange business in China and Japan. This call was quite generally resisted by shareholders as being a departure from the plaintiff's business and beyond

30

its powers. The defendant received no notice of that call. In 1891 the defendant, in Yokohama, Japan, purchased through brokers six hundred and fifty ordinary shares of the plaintiff's stock. They were paid for in Japan and dividends were paid there. These shares, with those purchased through an agent elsewhere, were registered in Hong Kong, and comprise the six hundred and eighty-five shares, to recover a call upon which this action was brought. Late in 1894 the plaintiff having practically abandoned the trust and loan business, and its shareholders having refused to pay calls for doing banking business, its directors decided to adopt a scheme which provided for a new company to take over the business and property of the plaintiff and to carry on banking in all its branches. The scheme adopted in effect provided that any stockholder of the plaintiff who did not go into the new company, taking share for share, should pay the total amount unpaid upon his old shares; but if a stockholder took shares in the new company, no calls upon the old shares were to be paid to the plaintiff and only three pounds fifteen shillings were to be paid to the new company. Nominally the new shares were eight pounds each, but five shillings were to be paid for each share in the plaintiff company surrendered by those coming into the new scheme, leaving four pounds which might be called up, but the stockholders in the new company were informed it would never be needed and it has never been required. December 3, 1894, this scheme was outlined to certain shareholders and creditors. On the same day an extraordinary meeting of shareholders was called for December twelfth to consider and, if thought best, to adopt by special resolution under section 161 of the Companies Act the scheme for the so-called reconstruction. The meeting was held December twelfth in London, but the defendant was in New York and had no notice of it. No shareholder from any other country was present in person or by proxy. Out of two hundred thousand shares, over one hundred and twenty-five thousand were on the eastern register for China and Japan, and less than seventy-five thousand on

the London register. The notices of the meeting of share-holders were not mailed for transmission to the plaintiff's agents at Yokohoma where the defendant's address was registered until December 7, 1894, so that a notice could not reach there until after the meeting was held, five days later. The only notice that it is pretended the defendant had of this meeting was a posting of it on the wall of the plaintiff's office in London some time in December. There is no evidence that even one-tenth of the capital issued was represented at that meeting. Still, three resolutions were voted by it: 1. That the company be voluntarily wound up with a view to reconstruction, and that its secretary be named as liquidator; 2. That the liquidator be authorized to consent to the formation of a new company under such name as the directors approved, with a memorandum and articles already prepared with the privity and approval of the directors; and 3. That the draft agreement submitted between the company, its liquidator and a blank company be approved and the liquidator be authorized, pursuant to section 161 of the Companies Act, to enter into an agreement with such new company in the terms of the drafted agreement, and to carry it into effect with such, if any, modifications as he might see fit to assent to. Notices convening meetings at which resolutions are to be submitted in favor of proceedings to wind up a corporation under section 161 of the Companies Act, are required to clearly inform the shareholders that it is proposed to proceed under that section. The notices in the proceedings to wind up the plaintiff contained that statement. A new company under the name of "The Bank of China and Japan, Limited," was registered December 28, 1894, the day of the confirmatory meeting. The same persons were directors of the new company as were directors of the plaintiff and the memorandum and articles previously prepared by them were adopted. On the same day the agreement was signed, and the liquidator applied to the court to summon a meeting of the creditors and to procure the court's sanction to the scheme so that the creditors would be bound. At the same time a supervision order in the

winding-up proceeding was sought from the court to enable it to continue as a voluntary winding up as distinguished from a compulsory one by the court which was asked for by some of the creditors. The scheme made certain provisions for creditors which, when approved by a majority and sanctioned by the court, were binding upon them. An investigation of the accounts of the old company disclosed that on December thirty-first there was an apparent deficit of only two hundred and eighty thousand pounds instead of eight hundred thousand, as was claimed by the chairman at the stockholders' meeting less than three weeks before. The scheme was modified in the interest of creditors to avoid an attack by them under section 161. By May 14, 1898, they were paid in full and only one hundred and eighty thousand pounds in addition to the tangible assets of the plaintiff was required for that purpose. No account was taken of the good will of the old company which was received by the new. As early as May, 1895, it was apparent that not more than two hundred thousand pounds would be required to pay the debts of the old company. One pound fifteen shillings per share contributed by the stockholders of the old company, who joined the new, paid all the debts of the plaintiff and left a balance of two pounds per share, amounting to two hundred and fifteen thousand pounds as capital for the new company. December 12, 1894, the capital of the plaintiff was 1,643,641 pounds, upon which the liquidator claims to have called for the benefit of the new company all that was unpaid on the shares of those who did not come into the scheme, amounting to 126,840 shares and representing a call of about one million pounds. At the time of the trial only about one-half of the shareholders in the old company had taken shares in the new. The amount of the alleged calls which were uncollected was about seven hundred thousand pounds, one-third of which would repay the new company for all it had contributed to discharge the plaintiff's debts. Payment of the call upon the defendant would confer no rights upon him in the new company, and he never agreed to take shares in it. The directors

of the new company claim that the liquidator has no authority or discretion as to the amount which should be paid upon such calls, but that the whole amount unpaid thereon belongs to the new company, although unnecessary to pay the debts and expenses of the old company, or to equal contributions among its shareholders. The scheme did not provide that the surplus should be divided among the shareholders of the old company, but required it to be paid to the new company for its benefit. Before proceeding to the consideration of the merits of this controversy, it is deemed best to first consider several subsidiary points which relate to the procedure and principles which have more or less bearing thereon.

Although the plaintiff, as a second cause of action, set up a judgment against the defendant, obtained in the English courts in an action wherein the process was served in this state, yet that cause of action appears to have been abandoned upon the trial, evidently on the ground that the English courts had no jurisdiction therein to render a personal judgment binding upon the defendant. The rule is elementary that no sovereignty can extend the process of its courts beyond its territorial limits, or subject either the person or property of a party to its judicial decisions or judgments, where neither he nor his property is within its boundaries. Any attempted exercise of such authority would be beyond the power of the sovereignty to grant, and, as all judicial power must flow from the state or commonwealth, its grant of power is necessarily defined by its boundaries, and no service outside would confer any jurisdiction of the person or property of a defendant so situated. It is, therefore, manifest that the English court acquired no jurisdiction of the defendant which would enable it to award a personal judgment against him, and no judgment or order thus obtained has any force or effect in this state either to bind the defendant personally or his property therein.

We have in the record not only the statute relating to the subject involved, but also the decisions of the English courts bearing upon the principal question. Although what the

foreign law is, is usually denominated a question of fact, yet, when it merely involves the construction of a written statute or the interpretation of judicial opinions, it becomes a question of law. The appellant, however, contends that foreign law is to be proved as facts to the court and not to the jury, and then argues that the decision of the Appellate Division that the construction and effect of the statute was not a question of fact, but a question of law for the court, was erroneous. That when it becomes necessary to establish the law of a foreign country it must be proved as facts are proved, there is no doubt, but when, after such proof is given, the questions involved depend upon the construction and effect of a statute or judicial opinion, we think those questions are for the court and not questions of fact at all. (Chase's Stephen's Digest of the Law of Evidence, 146; *Hanley* v. *Donoghue*, 116 U. S. 1; *Ufford* v. *Spaulding*, 156 Mass. 65; *Molson's Bank* v. *Boardman*, 47 Hun, 135; Story on Conflict of Laws, § 638; 1 Greenleaf on Evidence, § 486; *Kline* v. *Baker*, 99 Mass. 253, 255; *Shoe & Leather Nat. Bank* v. *Wood*, 142 Mass. 563, 568.)

We may, however, in passing consider the result that might follow if the theory of the appellant were correct. There was something of a conflict in the evidence as to what the law of England was and its effect upon the questions under consideration. Upon one hand were the statutes and decisions of the English courts tending to show that the statute as construed by the courts of England did not authorize the plaintiff to transfer to the new company the right to enforce calls upon the shareholders of the old one, nor a right to the proceeds of calls to be subsequently made. On the other hand, the testimony of the experts whose evidence was read on the trial was to the effect that it was the custom of the courts of England to authorize and sustain such transfers. In this case a motion for a new trial was made upon the exceptions and because the verdict was contrary to the evidence and contrary to law. This motion was denied by the trial court and upon appeal was reversed by the Appellate Division and a new trial granted.

There is nothing in the order of the Appellate Division to show that it was affirmed as to the facts or that the appeal therefrom was dismissed. This court has frequently and uniformly held that an order granting a new trial in an action tried by a jury, where there is a conflict in the evidence and the order may have been upon the facts, is not reviewable in this court unless it appears from the record that the order was affirmed as to the facts or the appeal therefrom dismissed. ( *Wright* v. *Hunter*, 46 N. Y. 409 ; *Harris* v. *Burdett*, 73 N. Y. 136 ; *Snebley* v. *Conner*, 78 N. Y. 218 ; *Kennicutt* v. *Parmalee*, 109 N. Y. 650 ; *Voisin* v. *Commercial Mut. Ins. Co.*, 123 N. Y. 120, 131 ; *Peil* v. *Reinhart*, 127 N. Y. 381, 385 ; *Williams* v. *D., L. & W. R. R. Co.*, 127 N. Y. 643 ; *Chapman* v. *Comstock*, 134 N. Y. 509, 512 ; *Mickee* v. *W. M. & R. M. Co.*, 144 N. Y. 613 ; *Hoes* v. *Edison General E. Co.*, 150 N. Y. 87 ; *Henavie* v. *N. Y. C. & H. R. R. R. Co.*, 154 N. Y. 278, 280 ; *Judson* v. *Cent. Vt. R. R. Co.*, 158 N. Y. 597, 600 ; *Schryer* v. *Fenton*, 162 N. Y. 444 ; *People ex rel. McDonald* v. *Clausen*, 163 N. Y. 523, 525.) Therefore, if the contention of the appellant were upheld, it would seem to follow that as the court below may have reversed upon the facts, the order appealed from is not reviewable by this court.

The plaintiff's claim to recover in this action is based upon the theory that it is an English corporation ; that the contract of subscription for shares was an English contract which should be interpreted under the English law, and that when the defendant entered into it he agreed to whatever liability the English law imposed upon him as a member of the corporation. If this be assumed, still, if the scheme was one which could not be enforced under the English law, clearly it will not be enforced by the courts of this state. The plaintiff insists that a call, whether made by the directors or by the court, unless directly attacked and set aside by judicial proceedings, is conclusive evidence of the necessity of the call and binds every stockholder to that extent without service of personal notice upon him. We think that broad proposition cannot be

sustained, so far at least as it affects the question involved in this action. If the purpose for which these calls were made was illegal and unwarranted, it is manifest that under our system of practice and procedure the illegality of the call or the absence of authority to make it can be set up as a defense in an action to recover the amount. (Code of Civil Procedure, § 507.) It also seems to be the law of England that in an action against a shareholder to recover for a call made upon his shares, it is a defense that the call was not warranted by the constitution or articles of association of the company. (*East Anglian R'way Co.* v. *Eastern Counties R'way Co.*, 11 C. B. 775, 811; *Colman* v. *Eastern Counties R'way Co.*, 10 Beav. 1, 14; *Bloxam* v. *Met. R'way Co.*, L. R. [3 Ch. App.] 337; *Forrest* v. *Manchester, &c., R'way Co.*, 30 Beav. 40; *Munt* v. *Shrewsbury & Chester R'way Co.*, 13 Beav. 1, 5; *Simpson* v. *Denison*, 10 Hare, 51; *Salomons* v. *Laing*, 12 Beav. 339.) Although in the English courts the method of establishing the illegality of the call may be regulated by a procedure differing from that which obtains in this state, as by obtaining an injunction to restrain the action of the company, or by procuring a judgment setting it aside, still, that would in no way change the result, as the difference relates to a mere matter of procedure. The procedure in this action is controlled by the law of this state, and under our law it is obvious that the claimed illegality can be set up as a defense to an action brought to enforce such a call.

The substantial purpose of this action was to enforce against the defendant a scheme entered into by the plaintiff with the Bank of China and Japan, Limited, and for the benefit of the latter company to recover from the defendant calls made by the plaintiff or its liquidator for the entire amount unpaid upon the shares held by him. Unless, however, the plaintiff's scheme or the procedure under it has in some way imposed upon the defendant a personal liability to pay calls for the benefit of the new company, or unless he is absolutely liable by virtue of his having become the owner and holder of shares of the plaintiff company, independent of and notwithstanding

such proceeding, it is quite evident that the plaintiff was not entitled to a judgment, and that the judgment directed by the trial court was properly reversed.

The defendant contends that the plaintiff's scheme did not impose upon him a personal liability for the amount unpaid upon his shares, and that he is not liable to pay calls to the plaintiff for the benefit of the new company, to whom the former has attempted to transfer that right. That the plaintiff and its successor were both organized under the English Companies Act of 1862 and the amendments thereto, and that the winding up of the plaintiff and the transfer of its business and property to the new company were regulated and controlled by the same statute, is obvious and not denied. Part four of the Companies Act relates to the winding up of companies and associations organized under it. It first provides for the winding up of such a company or corporation by the court, and, secondly, for a voluntary winding up by its officers and shareholders. The provisions of the statute relating to these two methods, although a part of the same act, are essentially different in several respects. The statute to an extent confers upon such an association or company power to determine whether the winding up shall be by the court, or voluntary.

Section 161 of that act, which relates to the voluntary winding up of such companies, provides : " Where any company is proposed to be or is in the course of being wound up altogether voluntarily, and the whole or a portion of its business or property is proposed to be transferred or sold to another company, the liquidators of the first-mentioned company may, with the sanction of a special resolution of the company by whom they were appointed, conferring either a general authority on the liquidators, or an authority in respect of any particular arrangement, receive in compensation or part compensation for such transfer or sale shares, policies or other like interests in such other company, for the purpose of distribution amongst the members of the company being wound up, or may enter into any other arrangement whereby the mem-

bers of the company being wound up may, in lieu of receiving cash, shares, policies, or other like interests, or in addition thereto, participate in the profits of or receive any other benefit from the purchasing company; and any sale made or arrangement entered into by the liquidators in pursuance of this section shall be binding on the members of the company being wound up." These provisions, however, are made subject to a proviso that any dissentient member may, by a method therein pointed out, require the liquidator either to abstain from carrying the resolution into effect, or to purchase the interest held by the dissentient member at a price to be determined in a manner therein specified.

That it was the purpose of the plaintiff, and that it and its officers and such shareholders as joined in the proceeding to wind up the plaintiff company intended to institute proceedings for a voluntary winding up, is rendered perfectly plain by examining the notices and other papers therein. It is equally clear that the scheme was entered into in pursuance of that section. In the notices which called the meeting of stockholders and creditors it is specifically stated that the scheme was entered into and the meeting called in pursuance of it. In the minutes of the meetings held December twelfth and twenty-eighth, in each case, it is so stated. The scheme as proposed and signed by all the parties thereto and as it was afterwards modified and finally signed, both recited that fact. Therefore, in the further discussion of the questions involved it will be assumed that the proceedings which resulted in the scheme for the transfer of the business and property of the plaintiff to the new company were inaugurated, continued and carried into effect under and in pursuance of section 161.

Thus we are brought to consider whether, where a corporation or association organized under the English Companies Act procures the organization of a new company under the same statute to carry into effect the provisions of section 161, and then transfers to the new company all of its business and property, such transfer includes the right of the first company

to bind its dissenting stockholders to make good by way of
calls the sums unpaid on shares held by them for the benefit of
the new company, or to enter into a contract to that effect;
in other words, whether the old company under a voluntary
winding up can make a valid contract binding upon dissenting
members to buy the shares of a new one with anything but the
existing assets at the time of liquidation.   This question is
dependent for its solution upon the proper construction of
section 161, and as we have already seen it is the duty of this
court to construe that section in the light of the English
authorities unless foreclosed from examining it by the opinions
of witnesses who, without producing any authority showing
the existence of such custom or any case in which it was
applied, testified upon the trial as to the custom of the
courts of England in dealing with such questions.   Reverting
to section 161, we find that where a company is being wound
up voluntarily, the whole or a portion of its business or
property may be transferred to another company with the
sanction of a special resolution of the original company, and
the old company may receive in compensation for a transfer
of its "business or property" shares, policies and other like
interests in such company for the purpose of distribution
among the members of the company being wound up.   The
first point presented involves the meaning of the words "busi-
ness or property" as used in that section.   Upon that question
we have direct authority in the decisions of the English courts.
In *Clinch* v. *Financial Corporation* (L. R. [5 Eq. Cases] 450,
476; L. R. [4 Ch. App.] 117) the question was whether a
scheme of amalgamation or reconstruction was valid under
section 161 of the Companies Act.   The objection was that
by the scheme the corporation being wound up had disposed
of unpaid subscriptions to its shares not yet called, and that it
required the liquidator to call from the shareholders of the
company a certain amount upon their shares, which was to be
turned over to the purchasing company as a portion of the
business and property transferred.   It was there held that the
only question presented was whether that arrangement could

be supported under section 161 of the Companies Act. It was further held that there was nothing in that section which authorized the winding-up company to buy shares of another company with anything but the assets on hand at the time of liquidation, and that it did not apply to assets to be obtained by calls upon the holders of its shares. That case was affirmed upon appeal, and the law as laid down by the vice-chancellor was sustained. In that case the trial court said : " There is nothing in that section which authorizes a contract binding dissentient shareholders to make good, by way of call, the sums of money which may be necessary to make up a call of two pounds a share; in other words, to buy the shares of another company with anything but the assets of the company. Such assets are the assets at the time of liquidation, not assets to be got by subsequent calls, in order to make good an arrangement of this kind, and to force the reluctant share-holders into paying two pounds a share, which will be a pay-ment not for their benefit, if they do not choose to take shares, and if not for their benefit, then for the benefit of those who do take shares. That would be an act of the most pre-posterous character — it would give a majority of the share-holders the power of binding the minority, not only to take shares in another concern, but to submit to calls being made upon them for the purpose of raising the sum which was to be so advanced." That case was cited with approval in *Blatchford* v. *Ross* (54 Barb. 42, 46). It is to be observed that it is only the business or property of the corporation being wound up that can be transferred under the provisions of that section. When the meaning of the words " business or property " is considered, it is obvious that " business " does not include uncalled capital, and the word " property " has not only been construed as not including calls upon stock-holders in the *Clinch* case, but a similar principle of construc-tion has been established by other cases in the English courts. (*Stanley's Case*, 4 De G., J. & S. 407; *In re Streatham and General Estates Co.*, L. R. [1897, 1 Ch.] 15; *In re Colonial Trusts Corporation*, L. R. [15 Ch. Div.] 465.) Not only do

these cases in effect hold that it was alone the property which the company had in hand at the time of the commencement of its proceedings to wind it up that it could transfer to the new company, but one of the expert witnesses called by the plaintiff testified that under section 161 no such scheme could be properly passed, and that the *Clinch* case is a correct interpretation of that section.

But it is insisted by the appellant that inasmuch as the voluntary winding up of the old company was subject to the supervision of the court, that fact affected the operation of section 161, so that the winding up is to be considered not as a winding up under that section, but as a winding up by the court. This insistence does not, however, seem to be sustained by the decisions of the English courts. (*In re Imperial Mercantile Credit Assn.*, L. R. [12 Eq.] 504, 513; *In re New Flagstaff Mining Co.*, Weekly N. [1889] 123.)

Moreover, section 147 of the Companies Act expressly provides for continuing a voluntary winding up under an order of the court and subject to its supervision. Indeed, such must have been the view taken by the parties, as the order in this proceeding of March twenty-seventh shows that the petition of the plaintiff and its liquidator sought for the continuance of a voluntary winding up subject to the supervision of the court as opposed to a winding up by the court upon the petition of the creditors, and the order was that the voluntary winding up be continued subject to such supervision. Under these circumstances, we think the plaintiff cannot now be heard to claim that the proceeding was under some other provision of the Companies Act or under some other statute and thus justify its proceedings. Besides, we find no authority, other than section 161 in the Companies Act, or elsewhere, which would even seem to justify the scheme entered into between the plaintiff and the new company.

The respondent also claims that this scheme was invalid because inequality of treatment of shareholders of the same class was attempted by it. It was plainly unequal as to the plaintiff's ordinary shareholders. If new shares were taken

by them they were expressly relieved from the payment of seven pounds fifteen shillings unpaid on their old shares and no calls therefor were to be made; if not, all the capital of the old company was to be called and payment enforced immediately, not for the benefit of it or its shareholders, but for the benefit of the new company which was composed wholly of old shareholders who took shares in the second company. The apparent purpose of this scheme was to compel all the shareholders of the old company to become shareholders in the new. It must, however, be conceded that shareholders of the old company could not be compelled to take shares in the new, and we find no authority, statutory or other, to justify a scheme which imposed upon shareholders refusing what they might properly refuse, a heavier burden than could otherwise be imposed. The equal and ratable distribution of the assets and the equal and ratable enforcement of the liabilities of a company, according to the interest of shareholders therein, is equitable and should be enforced, so that each shareholder may receive an equal proportion of the assets and contribute only an equal proportion to discharge its liabilities. This principle, we think, applies as well to the proceeds of calls as to property already in hand. 'n other words, shareholders have equal rights and must bear equal burdens. (1 Morawetz on Private Corporations, § 305.) This principle is especially applicable to a proceeding under section 161 of the Companies Act. (*Griffith* v. *Paget*, L. R. [5 Ch. Div.] 894; *Simpson* v. *Palace Theatre*, 69 Law Times, 70.)

Another vice in the scheme entered into is that the calls upon dissenting shareholders were excessive. If paid, they would have produced an amount much greater than was necessary to pay all the debts and liabilities of the old company. Futhermore, it provided that the fund thus raised, instead of being applied to that purpose and the remainder divided between the shareholders, was to be paid over to the new company for its benefit and the benefit of its shareholders. We find no authority that would justify a scheme so unjust and inequitable.

But the appellant suggests that if there had been a compulsory winding up and the company had realized its assets at their then depreciated values, a call of the total unpaid capital upon all the shares would have been necessary to pay the debts promptly, and thus it attempts to justify its excessive and unequal call. The respondent answers that there was no compulsory winding up or realization at depreciated values, and that if the unpaid capital had been called, the proceeds would have been used for the prompt payment of the debts without any forced realization upon the assets. There seems to be great force in these suggestions. But be that as it may, it is plain that we cannot deal with unproved suppositions or conjectures in determining the question before us.

The only theory upon which even the plaintiff's experts sought to justify the action of the plaintiff and the new company is based upon a provision in the scheme devised by them to that effect. But then follows the question: Where is there any warrant for such a scheme? We know of no principle or authority which would justify it. To sustain this scheme the plaintiff relies upon the general assertion of expert witnesses called on the trial, to the effect that such schemes were approved by the English courts. This we cannot regard as controlling, in view of the statute and decisions to which we have already adverted. The plaintiff in its brief·has many times asserted that the remedy of the defendant was to have opposed the scheme before it was sanctioned, and that failing to do so he was irrevocably bound. The fact is that he knew absolutely nothing of it, or that it was before the court until long after, so that the remedy suggested could hardly be regarded as complete or available to secure his rights.

Nor do we find anything in the Joint-Stock Companies Arrangement Act of 1870 which made this scheme, even upon its approval by the court, binding upon the defendant personally. The English Companies Act is not extra-territorial and binds only the person or property within the jurisdiction to which the act extends. In *New Zealand Loan and Mercantile Agency Co., Limited*, v. *Morrison* (L. R. [1898, Appeal Cases]

349) it was held by the House of Lords that the Joint-Stock Companies Arrangement Act of 1870 did not even apply to the English colonies, and, therefore, although a scheme of arrangement under that act was sanctioned by an English court, yet, as to the colonies it was a proceeding in a foreign court and could not be pleaded by the company in the Victorian court as a defense to an action by a non-assenting Victorian creditor for the amount of her claim. Thus we see that under the doctrine established by the English courts, this act was not applicable even to its colonies, and much less can it be held applicable in a foreign jurisdiction. It is perhaps true that, so far the defendant's interest in the old company was concerned, the English courts had jurisdiction to bind him and it even to the extent of confiscating his interests, yet we know of no principle under which the courts of this State can be required to enforce or be justified in enforcing such a scheme against the defendant personally.

There is no pretense that the defendant ever consented to the plaintiff's scheme, agreed to be bound by it, contracted to pay according to its terms or entered into any contractual relation with the company, its shareholders or creditors which rendered him liable thereunder. Nor do we think that any such contract could be implied from the mere purchase of the company's shares. If otherwise, then it is obvious that such a corporation has power to change the contract into which a shareholder originally entered in such a manner and to such an extent as it sees fit, without consultation or consent. If this may be done, the contract of the shareholder may be one thing when he becomes such, and subsequently changed to quite a different thing. In this case if such authority could be implied, the result would be that the defendant is made to adopt a contract in which there is a new beneficiary, to consent to inequality of contribution, to excess of calls, and his original contract is in effect wiped out and a new one substituted in its place entirely without his assent. *Paine* v. *Cork Co.* (69 L. J. Ch. 156) is to the effect that even though the articles of incorporation of a company or

association in terms confer upon a liquidator power to sell the assets for shares fully or partly paid up of another company, irrespective of the powers conferred upon him by statute, they are invalid, and the articles cannot deprive dissentients of the benefits conferred upon them by section 161. Although the defendant by purchasing shares in the plaintiff company assumed to pay all calls unpaid thereon necessary for the legitimate purposes of the old corporation, to pay its debts and discharge its liabilities, still there was no implied contract upon his part to become liable to pay calls upon his shares for the benefit of another company to whom the interests of the old company had been transferred. Nor could the English courts by any order made in the proceeding impose upon the defendant any such personal liability in the absence of personal service or appearance in the winding-up proceeding. As this court recently said, in discussing the effect of a judgment of a foreign state: "If the proceedings involve the determination of the personal liability of the defendant, he must be brought within the jurisdiction by service of process within the state, or voluntary appearance. If it be a proceeding *in rem* the *res* must have been seized or attached, or at least must be within the jurisdiction." (*Ward* v. *Boyce*, 152 N. Y. 191, 196.)

This court has held that where a liability sought to be enforced in our state courts has for its foundation the principles of common law and is contractual, it will be enforced upon grounds of state comity. (*Stoddard* v. *Lum*, 159 N. Y. 265; *Howarth* v. *Angle*, 162 N. Y. 179.) But the principle of those cases has no application or bearing upon the question involved in the case at bar. There it appeared that the corporation was insolvent, that the purpose of the call or the ground upon which a recovery was sought was to procure funds for the payment of its proper and legitimate debts, and it was held that the capital stock of a corporation was a fund set aside for the payment of its debts, and that creditors have a lien upon it which our courts will enforce to an extent necessary to attain that end. But we have never held that

such a liability will be enforced unless it exists under the principles of common law or under a contract which ought to be enforced. In *Marshall* v. *Sherman* (148 N. Y. 9) it was said that the liability of a stockholder of another state for the debts of a corporation, in case of its insolvency, created by the statute of such state, while not penal in its nature, is not a liability arising upon contract in a general sense, and that an action to enforce such liability in this state is not maintainable upon the theory that it is contractual and primary. Moreover, the decisions of the English courts to the effect that the scheme entered into by the plaintiff and the new company was invalid, and that the statute did not make the calls upon shareholders any part of the assets of the new company, are decisive of the question under consideration.

Under these circumstances, we think the courts of this state should not enforce a liability against one of its citizens, where it is seen that it is illegal, unequal and oppressive. The general rule is to the contrary and that courts will not enforce such a liability when it would be in violation of the policy of our own laws or do violence to what we deem the rights of our own citizens. Hence, it is clear that the courts of this state should decline to enforce the liability sought to be established by this action.

There is, however, one other point which should be considered. The plaintiff insists that even if the scheme of arrangement made between the companies and the liquidator was invalid, it was nevertheless error for the Appellate Division to reverse the judgment altogether since it in part rested upon the call of twenty shillings which was made by the directors. We find nothing to show that the plaintiff either upon the trial or subsequently presented or attempted to enforce any claim based upon that call, independently of the other. The whole claim seems to have been treated as one. It was passed upon by the court as a single claim. A judgment was directed for the full amount, and at this time, after the plaintiff had stipulated for judgment absolute in case no error was committed in granting a new trial, we think it too

late to claim that the judgment should have been for smaller amount. On such an appeal, if the record presents any error, either of law or of fact, made by the trial court which called for a reversal of the judgment, the order of the Appellate Division must necessarily be affirmed by this court. (*Cobb* v. *Hatfield*, 46 N. Y. 533; *Godfrey* v. *Moser*, 66 N. Y. 250; *Lake* v. *Nathans*, 67 N. Y. 589; *Gray* v. *Bd. Supers. Tompkins Co.*, 93 N. Y. 603; *Caswell* v. *Hazard*, 121 N. Y. 484.) Upon an appeal to this court from an order granting a new trial, the appellant takes the risk not only of the questions considered below, but of every other exception appearing upon the record. The respondent may sustain the order by showing any legal error, whether noticed by the court below or not. If, in considering such an appeal, the court determine that there was error upon the trial requiring an affirmance of the order, judgment absolute must be given against the appellant. (*Mackay* v. *Lewis*, 73 N. Y. 382; *Noyes* v. *Wyckoff*, 114 N. Y. 204, 206; *Reed* v. *McConnell*, 133 N. Y. 425, 430; *Foster* v. *Bookwalter*, 152 N. Y. 166.) We may, however, add that we discover no principle upon which the call for twenty shillings could be enforced under the circumstances disclosed in this action.

In considering the questions in this case we have not omitted to examine the excellent brief of the learned counsel for the appellant and the various cases upon which he relies. Nor have we forgotten his most persuasive and impressive argument. But it is impossible, within the limits to which this opinion should be confined, to examine in detail all the questions and authorities cited or to point out what seems to us the clear distinction between the cases cited by him and the case at bar. We have, however, examined all his authorities without finding any which justified the judgment of the trial court or which would justify us in reversing the judgment of the learned Appellate Division.

There are several other questions which were presented and argued by counsel and upon which the learned Appellate Division might have based its order of reversal, but having

reached the conclusion that the order appealed from should be affirmed upon the grounds already considered we deem it unnecessary, and, therefore, do not specially consider them.

The order of the Appellate Division should be affirmed and judgment absolute ordered upon the plaintiff's stipulation, with costs to the defendant in all the courts.

. PARKER, Ch. J., GRAY, BARTLETT, VANN, CULLEN and WERNER, JJ., concur.

Ordered accordingly.