Appeal of CENTRAL CONSUMERS                    Docket No. 646.
WINE & LIQUOR CO.

1. A stock subscription agreement of itself is not property, can not be regarded as such under the invested capital provisions of the Revenue Act of 1918, and a corporation may not include in invested capital the amount of unpaid subscriptions to its capital stock.

2. Under the Revenue Acts of 1917 and of 1918, actual values only may be included in invested capital, and the burden of proving actual value is on the taxpayer.

3. Where taxpayer corporation entered into cooperative agreements with retail liquor dealers whereby they became purchasers of its capital stock, and, in consideration of their agreement to purchase their supply of liquor from taxpayer, they received for each two shares of capital stock purchased one share of bonus stock, issued full paid and nonassessable, *held*, in the absence of evidence of actual value, that the bonus stock, charged on the taxpayer's books as good will, may not be included in its invested capital at par value.

4. A formula for computing the value of good will by attributing to tangible property a rate of 8 per cent and capitalizing the balance of the earnings on the basis of 15 per cent, will not be applied in computing obsolescence for loss of good will of a business rendered unlawful by prohibition legislation, where it appears that a rate of 10 per cent upon tangible property would substantially cover all the net earnings of the taxpayer upon the average for the 5-year period prior to March 1, 1913.

5. Special discounts paid to stockholders as an inducement to them to purchase goods from a corporation, being expenses and in no sense net earnings, may not be considered in determining the value of good will.

Submitted March 27, 1925; decided May 21, 1925.

*Arthur B. Hyman, Esq.*, for the taxpayer.
*John D. Foley, Esq.*, for the Commissioner.

Before JAMES, PHILLIPS, and GREEN.

This is an appeal from a determination of income and profits taxes for the years 1917 and 1918, the Commissioner having determined an overassessment in 1917 of $17,544.63, and an additional tax for 1918 of $7,285.30.

FINDINGS OF FACT.

The taxpayer is a New York corporation organized in 1902 as a cooperative dealer in wines and liquor.

In the beginning of its organization the taxpayer undertook to secure customers by a cooperative agreement with retail liquor dealers under which agreement they became purchasers of its stock and, in consideration of an agreement on their part to purchase their supply of liquor from the taxpayer, they received for every two shares of stock purchased by them one additional share of stock, called " bonus " stock, which was issued fully paid and nonassessable without other consideration than the agreement above referred to. The material portion of the subscription agreement read as follows:

I, the undersigned, subscribe hereto my name, post-office address and the number of shares of stock hereinafter stated at the par value of $100 each,

which I agree to take in the CENTRAL CONSUMERS WINE AND LIQUOR COMPANY, a corporation organized and incorporated under the laws of the State of New York, and I hereby agree to pay for such stock in monthly installments of Ten (10) per centum, and I further agree that I will not sell or transfer any such stock of this Company to any individual, copartnership, association or corporation, unless the transferee be a licensed saloon-keeper, and that I will not transfer nor sell any such stock without giving to the Company the option to purchase the same.

It was further provided in the by-laws of the taxpayer, with respect to the holding and transfer of the stock and with respect to the purchase of liquor by the stockholders, as follows:

ARTICLE 23, Section I. No stock of this Company shall be sold or transferred on its books to any individual, copartnership or corporation unless the transferee be actually engaged in the retail wine and liquor trade at the time of such transfer.

ARTICLE 27, Section 2. Every stockholder while in business shall agree to purchase goods from the company provided the quality and price of the goods offered are equal to the general standard.

In accordance with the above plan, stock was sold from time to time, and in the early years of the organization of the taxpayer, "bonus" stock was issued in various amounts. In the case of "bonus" stock so issued, the asset account charged was called "good will," and there was outstanding on such asset account in the taxable year 1917 the sum of $97,131.31, and in the year 1918, $92,631.31, the difference between the years being occasioned by the purchase of stock by the company in accordance with the above-quoted portion of the by-laws.

Conformably with the subscription agreement, capital stock was sold from time to time on the partial-payment plan, 10 per cent of such stock subscription being paid in conformity with the New York law at the time the stock was subscribed for. Stock so subscribed for was not issued until fully paid. In 1917, there was due and unpaid, as shown by the books of the company, on account of such stock subscriptions, the sum of $9,572.88, and for 1918, the sum of $9,100.00.

The taxpayer, virtually from its organization, enjoyed a successful and profitable business, selling liquor, substantially without exception, to stockholders only. Upon the basis of sales to stockholders it paid from year to year, during the period of its existence, special discounts of from 5 to 15 per cent of the stockholders' purchases. In addition the corporation paid dividends at the rate of 6 per cent annually upon the capital stock, including the "bonus" stock above mentioned.

For the five years, January 1, 1908, to January 1, 1912, inclusive, the taxpayer had for each year a net worth in tangible assets as follows:

| | |
|---|---|
| 1908 | $275,388.42 |
| 1909 | 285,377.24 |
| 1910 | 330,495.13 |
| 1911 | 367,705.42 |
| 1912 | 365,951.81 |
| Average | $324,983.60 |

For the five years, 1908 to 1912, inclusive, the taxpayer earned net income, after paying special discounts to stockholders, in the following amounts:

| | | |
|---|---:|---:|
| 1908 | $18,920.45 | |
| 1909 | 59,015.72 | |
| 1910 | 46,322.44 | |
| 1911 | 15,079.01 | |
| 1912 | 32,462.88 | |
| Average | | $34,360.10 |

During the said years, 1908 to 1912, inclusive, the special discounts paid to stockholders in the manner above set forth were:

| | | |
|---|---:|---:|
| 1908 | $22,155.57 | |
| 1909 | 17,504.44 | |
| 1910 | 21,512.82 | |
| 1911 | 41,072.42 | |
| 1912 | 31,548.08 | |
| Average | | $26,758.26 |

The net tangible worth of the taxpayer for the years 1913 to 1917, inclusive, as of January 1 of each of said years, was as follows:

| | | |
|---|---:|---:|
| 1913 | $479,491.00 | |
| 1914 | 503,549.75 | |
| 1915 | 478,509.04 | |
| 1916 | 469,798.56 | |
| 1917 | 479,970.02 | |
| Average | | $484,263.67 |

The net income for the period 1913 to 1917, inclusive, was:

| | | |
|---|---:|---:|
| 1913 | $39,868.75 | |
| 1914 (loss) | | $4,829.71 |
| 1915 | 20,825.52 | |
| 1916 | 27,233.26 | |
| 1917 | 57,409.87 | |
| Average | | $28,101.54 |

The taxpayer employed no salesmen, did no advertising, and obtained business in no other way than through the inducements offered to its original stockholders by reason of the "bonus" stock issued to them and to all of its stockholders by reason of the special discounts distributed upon their purchases.

The Commissioner, in computing the income and profits taxes of the taxpayer for the years 1917 and 1918, excluded from invested capital the sums of $97,131.31 and $92,631.31, above mentioned, and carried on the books of the taxpayer as good will. The Commissioner also excluded from invested capital the sums of $9,572.88 and $9,100.00, respectively, on account of amounts unpaid on subscriptions to capital stock.

The taxpayer further alleges that it is entitled to an allowance for obsolescence for loss of good will and going value in its business which was rendered unlawful as a result of the Eighteenth Amendment and the statutes adopted in pursuance thereof.

As a consequence of the adoption of the Eighteenth Amendment the taxpayer ceased doing business on or about January 16, 1920.

DECISION.

The determination of the Commissioner is approved.

### OPINION.

JAMES: The taxpayer alleges three grounds of appeal from the deficiency determined by the Commissioner. The taxpayer appears not to have claimed obsolescence of good will of its business in connection with its original returns for the years here in question, but it did make such claim in the course of its negotiations with the Commissioner concerning the deficiency here in issue.

The taxpayer claims that the Commissioner erred in refusing to include in its invested capital good will, so called, in the sums respectively for two years of $97,131.31 and $92,631.31. The origin of this account has been set forth in the findings of fact. It consists of the asset account set up to offset stock issued in the early years following the taxpayer's organization as a "bonus" to prospective purchasers of its wares and as a special inducement to them to become sharers in the enterprise. As evidence of value the taxpayer relies upon the fact that the stock was issued in consideration of the contracts of the stockholders to purchase liquor from the taxpayer, provided the taxpayer was able to furnish liquor of a quality equal to that which could be obtained elsewhere. That these contracts were a substantial asset is unquestionable. The only evidence of value, however, is contained in the fact that stock was issued therefor and remained outstanding in the amounts above set forth as of the beginning of the taxable years here in question. The taxpayer submits that that fact establishes a *prima facie* case of value which must be met by the Commissioner by proof to the effect that the stock did not issue for such value, and that, in the absence of such proof, the taxpayer is entitled to include these sums in invested capital.

Whether the stock so issued was issued to induce trading with the taxpayer, or whether it was issued in actual exchange for the stockholders' agreements to trade, is not regarded by the taxpayer as important, except as bearing upon the limitation of intangible values which may be included in invested capital as set forth in section 326 of the Revenue Act of 1918 and section 207 of the Revenue Act of 1917.

The taxpayer contends that to require proof of value other than the issue of capital stock fully paid and nonassessable is to presume irregularity amounting to fraud in the issue of such stock. Congress, however, has provided that invested capital includes only actual cash, *actual* cash value of tangible property and intangible property bona fide paid in for stock or shares in an amount not exceeding the *actual* cash value of such property, the par value of the stock or shares issued therefor, or, with respect to intangible property, in the aggregate 25 per cent of the par value of the total stock or shares of the corporation outstanding. It is clear that Congress, in the above provisions, was carefully providing for the inclusion of actual values only and must have intended to impose the burden of proof of such value upon the taxpayer claiming the invested capital. To such an extent is this intent apparent that an arbitrary limitation was placed upon intangible values paid in for stock or shares without regard to the actual values which might in some instances have exceeded this arbitrary limitation. If there is any implication in these provisions of the act with respect to im-

proper conduct upon the part of directors of corporations, that implication is in the act itself since, had Congress not intended the language used to have a special significance, it could and doubtless would have provided that property paid in for stock should be included in invested capital at the par value of the stock issued therefor. To construe the statute in the manner contended for by the taxpayer is to exclude all consideration of, and to give no effect to, the emphatic word "actual," repeatedly used in connection with property paid in for stock. We are of the opinion that the taxpayer has failed to prove that the contracts or the good will paid in for stock of the taxpayer had a value, and we must therefore affirm the determination of the Commissioner in this regard.

The taxpayer also claims invested capital for the years in question of $9,572.88 and $9,100 for balance due on stock subscriptions on which 10 per cent or more had been paid. In support of this position, it relies upon the decision in the *Appeal of Hewitt Rubber Co.*, 1 B. T. A. 424, and upon cited cases in the courts of New York to the general effect that subscription agreements, accompanied by an initial payment of 10 per cent, are enforceable and are included in the assets available for the use of the corporation. *Kohlmetz* v. *Calkins*, 16 App. Div. 518; 44 N. Y. Supp. 1031; *Stoddard* v. *Lum*, 159 N. Y. 265; 53 N. E. 1108; *Rochester & K. F. Land Co.* v. *Raymond*, 158 N. Y. 576; 53 N. E. 507; *Beals* v. *Buffalo Expanded Metal Construction Co.*, 49 App. Div. 589; 63 N. Y. Supp. 635; *Rathbone* v. *Ayer*, 84 App. Div. 186; 82 N. Y. Supp. 235.

We do not believe that the *Appeal of Hewitt Rubber Co.* supports such a position. In the *Hewitt Rubber Co.* case the stock was actually issued for the note in question and simultaneously with the making and delivery thereof. It is true that, as the taxpayer in this appeal urges, under ordinary circumstances notes given in payment of stock subscriptions are void and unenforceable. *Hapgoods* v. *Lusch*, 123 App. Div. 27; 107 N. Y. Supp. 334; *Van Schaick* v. *Mackin*, 129 App. Div. 335; 113 N. Y. Supp. 408; *Harriman National Bank* v. *Palmer*, 93 Misc. 431; 158 N. Y. Supp. 111.

But in *Harris* v. *Wells*, 57 Misc. 172; 108 N. Y. Supp. 1078, it was held that, where a subscription was accompanied by delivery of stock simultaneously with the delivery of a note in payment, this transaction would support an action on the note on the ground that the delivery of the note and the delivery of the stock constituted an express promise to pay, and that "where there has been an express promise, that promise may be enforced by action as in the case of any other contract liability," citing in support of this position *Rochester & K. F. Land Co.* v. *Raymond*, *supra*, and *Sanger* v. *Upton*, 91 U. S. 56.

It is unnecessary to cite authority to the effect that a promissory note is property, but the Court of Appeals of the State of New York, in at least one well considered opinion, has held that a stock subscription agreement is not in itself property. In the case of the *Bank of China* v. *Morse*, 168 N. Y. 458; 61 N. E. 774, action was brought by a corporation, a successor to the corporation in which defendant had subscribed for stock, to collect an unpaid balance on his subscription. The predecessor company transferred to the plaintiff in the case "all of its business and property," and plain-

tiff claimed that that transfer enabled it to collect upon the unpaid subscriptions to the stock of its predecessor. In deciding that the action could not be maintained upon this ground, the court said:

When the meaning of the words "business or property" is considered, it is obvious that "business" does not include uncalled capital, and the word "property" has not only been construed as not including calls upon stockholders in the *Clinch Case*, [5 Eq. Cas. 450; 4 Ch. App. 117,] but a similar principle of construction has been established by other cases in the English courts.

(The plaintiff there in question was an English company.)

If, for the purpose of such a case as the one just cited, a stock subscription agreement is not property, certainly it can not be regarded as property under the invested capital provisions of the Revenue Act of 1918. Upon this point, therefore, the case here is distinguishable from the *Hewitt Rubber Co.* appeal, and stock subscriptions may not be included in invested capital until the actual time when payment is made on account thereof.

Finally the taxpayer claims that it is entitled to an obsolescence allowance for loss of good will as a result of prohibition legislation. In support of this claim it sets forth its net earnings for the period prior to March 1, 1913, and by the use of an 8 per cent allowance on tangible property and a 15 per cent rate of capitalization of the balance of the income arrives at an alleged value of good will which it claims it should be permitted to amortize. On an average of $324,983.60 of tangible property it computes an allowance of $25,998.69 at the rate of 8 per cent, and, capitalizing the balance at 15 per cent, the value of the good will is computed at $55,742.73.

The above are the rates which this Board has heretofore allowed in the *Appeal of Dwight & Lloyd Sintering Co.*, 1 B. T. A. 179, where it was said:

In view of the known stability of the business of the taxpayer with reference to its earning power it is the opinion of the Board that the value of its patents and intangible assets taken together should be determined by attributing to tangible property a return of 8 per cent and capitalizing the balance of the earnings on the basis of 15 per cent instead of by attributing 10 per cent to tangible assets and capitalizing the balance of the earnings on the basis of 20 per cent as was done by the Commissioner.

The *Dwight & Lloyd Sintering Co.* appeal is not applicable here. In this appeal a rate of 10 per cent upon tangible property would substantially cover all the net earnings of the taxpayer upon the average for the five-year period prior to March 1, 1913. Such being the case, it does not appear that there was any substantial amount of good-will value owned by the taxpayer and used in its business on March 1, 1913.

The taxpayer urges that the special discounts paid its stockholders on their purchases should be considered in determining the value of the good will, but the special discounts were the very basis of the taxpayer's business. Its special discounts were expenses of the business, just as advertising and the cost of salesmen were expenses of its competitors. Being expenses and in no sense net earnings, the amounts of such special discounts can not by their very nature enter into any computation to measure good will or going value of the petitioner's business.

It follows from the foregoing that the determination of the Commissioner must be affirmed.