new trial ordered.  The plaintiff is also directed to restore the fund to the custody of the Municipal Court within five days after the service of a copy of the order entered herein with notice of entry thereof. All concur.

O'ROURKE v. CUNARD S. S. CO., Ltd.

(Supreme Court, Appellate Division, Second Department.  June 17, 1915.)

1. CARRIERS ⊚⟳234—TRANSPORTATION OF PASSENGERS—WHAT LAW GOVERNS.
    A contract for the carriage on an English steamship of a passenger from Queenstown to New York is governed by English law in determining damages recoverable for a breach of contract, and only such damages as naturally flow from a breach or are contemplated by the parties are recoverable.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 965, 1263, 1538; Dec. Dig. ⊚⟳234.]

2. CARRIERS ⊚⟳277—CARRIAGE OF PASSENGERS—DAMAGES FOR BREACH OF CONTRACT.
    A female passenger, occupying, with 23 other female passengers, a room, was seized by the matron and a steward and charged with being the mother of a child found dead in the room, and was compelled to go to the ship's hospital, where the ship's surgeon several times forcibly examined her and charged her with being the mother of the child.  She was detained as a prisoner from Wednesday morning until Thursday night, when the mother of the child was discovered.  *Held*, that a verdict for $35,000 was excessive, and must be reduced to $17,500.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1082–1084; Dec. Dig. ⊚⟳277.]

    Jenks, P. J., dissenting.

Appeal from Trial Term, Nassau County.

Action by Catherine O'Rourke against the Cunard Steamship Company, Limited.  From a judgment for plaintiff, defendant appeals. Conditionally affirmed.

See, also, 161 App. Div. 885, 145 N. Y. Supp. 1136.

Argued before JENKS, P. J., and THOMAS, CARR, STAPLETON, and RICH, JJ.

Howard Mansfield, Lucius H. Beers, and Henry De Forest Baldwin, all of New York City, for appellant.

Arthur T. O'Leary, of New York City, for respondent.

PER CURIAM.  The parties hereto having stipulated in open court that a Justice may be substituted in place of BURR, J., deceased, Mr. Justice STAPLETON was so substituted.

Judgment and order reversed, and new trial granted, costs to abide the event, unless within 20 days plaintiff stipulate to reduce the recovery of damages to the sum of $17,500, in which event the judgment, as so modified, and the order, are affirmed, without costs.

[1, 2] The court is of opinion that the question of damages submitted to the jury is in accordance with the English law, that such

damages are recoverable as naturally flow from the contract or are contemplated by the parties to the contract.

THOMAS, CARR, STAPLETON, and RICH, JJ., concur.

JENKS, P. J. I vote to reverse. I adopt as an expression of my reasons the following opinion that was prepared by the late Mr. Justice BURR, who originally sat in the case. This opinion received my concurrence during his lifetime. Moreover, I think that the judgment should be reversed for excessive damages.

The opinion of Justice BURR, now deceased, follows:

Plaintiff recovered a verdict of $35,000 damages for breach of a contract of carriage with defendant. From the judgment entered on this verdict, and from an order denying a motion for a new trial, this appeal comes.

Plaintiff's narrative of the events upon which she bases her claim may be thus summarized: In April, 1911, at the town of Ballinlough, in the county of Roscommon, Ireland, she, being then 19 years of age, entered into a contract with defendant for transportation, as a third-class passenger, from Queenstown to New York. She sailed from the former port on Sunday, April 16th, in the steamship Campania. With 23 other women she occupied, for sleeping purposes, a room in that part of the ship known as the third cabin. On the Friday preceding her departure, plaintiff's period of menstruation began, and continued until the succeeding Tuesday; and the evidence would indicate that it was so profuse in character that not only her person but her underclothing, and the bedding upon which she slept, was stained thereby. At some time during Tuesday night, one of the women in the room where plaintiff was sleeping was delivered of a child. So far as the evidence discloses, this was without the knowledge of any one occupying the room with her, and she was without medical or other attendance. The dead body of a full-term child was found the next morning, in a bucket in the scupper. On Wednesday morning, when plaintiff sought to go on deck, in the presence of a large number of passengers, both men and women, she was seized by the stewardess or matron and one of the stewards, both in defendant's employ, accused of being the mother of the child, and in spite of her denials, and against her will dragged below, and compelled to go to the ship's hospital. Upon entering the hospital, the ship's surgeon appeared, compelled her to undress, struck her with a towel because she did not hurry to remove her clothing, compelled her to lie down in one of the berths in the hospital, and, with the assistance of the matron, forcibly held her there and proceeded to an examination of her person. He inserted his fingers into her vagina at least 12 times, pounded on her stomach, and squeezed and pinched her breasts for half an hour. At the close of the examination the surgeon stated to the matron that "she is the girl that had this baby." The matron and the surgeon then went out and locked the door, leaving plaintiff a prisoner. About half past 12 of the same day they returned, and for another period of from 15 minutes to half an hour plaintiff was subjected to similar brutal and inhuman treatment. At 5 o'clock in the afternoon they again appeared, and, for an hour, the surgeon subjected her to similar abuse, pounding her stomach, pinching her breasts, and wounding and tearing the vagina. During each of these examinations the surgeon, with profane and abusive language, urged her to admit the maternity of the child, and promised to release her if she would do so. Upon her refusal they left her locked in the room, without food or drink, until Thursday. About half past 2 on Thursday afternoon she was for the first time given nourishment. In the meantime, and on Thursday morning, she was again visited by the surgeon and the matron, and subjected by him to a similar physical examination for more than half an hour. When he left her he again locked the door; but in the afternoon, about half past 2, he returned with the matron, slapped plaintiff in the face, and administered similar treatment. Plaintiff testified that he used his hand around her vagina, "cut and tore me, pounded on my stomach, and squeezed and pinched my breast until I was

almost fainting," and continued this "for half an hour," saying to her, "if you own up to it [that is, having borne the child], I will let you out." Again locking the door, he left her, returning about 8 o'clock. On this occasion plaintiff was subjected to no physical examination, but, as she testifies, he said: "Own up to the baby and I will let you out this minute. * * * I won't let you out until you own up to this." That night the matron slept in the hospital with plaintiff. The same night, about 10 o'clock, the real mother of the child was discovered. It was not entirely clear whether the information was conveyed to the ship's officers, including the surgeon, on that night or on Friday night. Be that as it may, plaintiff testifies that on Friday morning the surgeon, with the matron, again visited her; and the former, "cursing, damning, swearing" at that time pulled off the blanket which was over her, and "for at least an hour" used his hands about her vagina, causing her to bleed to such an extent that the sheet upon which she was lying was soaking wet, pinched and pounded her stomach, and pinched and squeezed her breasts, telling her that if she owned up to the baby he would let her out. On Friday afternoon she was released.

This remarkable story is substantially uncorroborated, except that three of plaintiff's fellow passengers testified that they saw her being forcibly led away, screaming and crying. Two of them also testified that they heard her crying in the hospital, and, one of them, that she heard her shaking the door. The story, if true, reveals a course of conduct on the part of the ship's surgeon not only wholly unnecessary, at least after the first examination, but fiendish in its brutality; and that, too, in the presence of and without objection on the part of the matron. Uncontradicted, its improbability taxes credulity. It was contradicted, not only in every essential feature as to the conduct of the examination, and as to the reasons for suspecting plaintiff, but in many otherwise unimportant particulars we think it quite conclusively appears that plaintiff and her witnesses were mistaken. As the judgment must be reversed for errors in the conduct of the trial, and as a new trial must follow, we deem it unwise at the present time to discuss the conflicting evidence or to further consider the weight thereof.

The character of this action has been previously determined. At the threshold of the litigation, defendant moved to compel plaintiff separately to state and number the causes of action contained in her complaint, so as to distinguish between those founded upon breach of contract to transfer her safely and those founded upon alleged tortious acts committed against her by the defendant while engaged in fulfilling its contract. The motion was denied upon the ground that the complaint stated but one single cause of action, and that for breach of a contract for safe carriage. Upon appeal to this court that order was affirmed. O'Rourke v. Cunard Steamship Co., 161 App. Div. 885, 145 N. Y. Supp. 1136. This, therefore, is the law of the case. Defendant and plaintiff alike must be held to the consequences of that decision. We are of opinion also that this contract must be construed in accordance with the laws of England, and not in accordance with the laws of this state. The ticket given to plaintiff, when she purchased transportaion from defendant, is described as a "Contract Ticket." It contains various provisions respecting the obligations and privileges both of common carrier and passenger. It contains, among others, this provision: "All questions arising on this ticket shall be decided according to English law, with reference to which this contract is made." A ticket may be either a contract or a voucher, and whether the ticket of the plaintiff was the one or the other depended upon the inference to be drawn from what was said and done when she bought it, as well as on the form of the ticket itself. Hutchins v. Pennsylvania R. R. Co., 181 N. Y. 186, 190, 73 N. E. 972, 106 Am. St. Rep. 537. No evidence was offered under the former head, except that plaintiff testified that the agent told her that "this ticket" would give her a safe voyage. The most casual inspection of the ticket itself would indicate that it was more than a mere voucher that her passage money had been paid. Plaintiff admits that she had it in her possession five days, and that she read it sufficiently to see her name written thereon. As this writing was some distance from the top of the ticket, as the first words thereon in large type were "Passengers' Contract Ticket," as plaintiff's name did not appear until the seventh paragraph or subdivision

thereof, it is hardly a worthy contention that she did not know that it was not exactly what it purported to be—written evidence of the transportation contract. There is not only no evidence that the clause hereinbefore referred to was in different or smaller type from the previous portions thereof, but the uncontradicted evidence is to the contrary. But, if there were no contractual provision on the subject, it appears that plaintiff was a British subject, the defendant a British corporation, the contract was made in the kingdom of Great Britain and Ireland, and was to be carried out, and was carried out, at least until long after the occurrences here complained of, upon a British ship, upon the high seas. Under such circumstances, we think that the action is one governed by British law. Schweitzer v. H.-A. P. A. Gesellschaft, 149 App. Div. 900, 134 N. Y. Supp. 812. This being so, the learned counsel for appellant contends that, both under the statutory and common law of England, defendant is not responsible for the acts of the ship's surgeon in making a physical examination of plaintiff.

From this proposition, under the circumstances here disclosed, thus broadly stated, we must withhold our assent. Defendant introduced in evidence a public general act of Parliament, entitled "An act to consolidate enactments relating to merchant shipping passed August 25, 1894, being chapter 60 of Statutes 57 and 58 Victoria," by which, among other things, a ship of the description of the Campania was required to carry a duly authorized medical practitioner, and for failure so to do was declared to be liable to a fine of 100 pounds sterling. The same act required the master of every British ship, as soon as may be after the occurrence, to record the birth of a child happening on board his ship and to record in his log book or otherwise the birth "and the particulars required by the eighth schedule of this act to be registered concerning the birth  *  *  *  or such of them as may be known to him." The eighth schedule referred to required the master to register the date of birth, name (if any), and sex of the child, the name, surname, rank, profession, or occupation of the father, the name, surname, and maiden surname of the mother, with the nationality and last place of abode of each. That the surgeon was acting under the master's general instructions is clear. He testified that the master of the ship instructed him "to go down and make every inquiry to find out who was the girl blamable. I was to do my very utmost to find out who was the girl." But it seems quite clear that by this statute no obligation was imposed upon the master, forcibly and against the will of the passenger, to subject her person to exposure and physical examination. The statutory duty imposed was to register such of the particulars specified "as may be known to him." Doubtless it was his duty to ascertain by inquiry such facts as might be thereby elicited; but if any statute could authorize a forcible physical examination which involved the compulsory exposure of a woman's private parts to a person of the opposite sex, even though he be a physician, and the manipulation thereof against her will (see Schloendorff v. New York Hospital, 211 N. Y. 125, 105 N. E. 92, 52 L. R. A. [N. S.] 505), this authorization and requirement must be expressed in totally different language from that which is here employed. Neither under the common law of England is defendant immune from the consequences of the acts of the ship's surgeon, if plaintiff's recital thereof is true. If we correctly understand appellant's position in this regard, it is that because the English statute above recited requires the ship to employ and carry a surgeon, to whom, in case of need, a passenger could apply for surgical aid and medical attendance, in effect it became a free hospital, and, if due care is exercised in the choice of the surgeon, defendant is not liable for his acts, whether of negligence or trespass done in a professional capacity. Schloendorff v. New York Hospital, 211 N. Y. 125, 105 N. E. 92, 52 L. R. A. (N. S.) 505; Laubheim v. De K. N. S. Co., 107 N. Y. 228, 13 N. E. 781, 1 Am. St. Rep. 815; O'Brien v. S. S. Co., 154 Mass. 272, 28 N. E. 266, 13 L. R. A. 329. The difficulty with this contention is that the relation of physician and patient did not with plaintiff's consent arise between her and the ship's surgeon. She did not require medical treatment. She did not seek the surgeon's aid. If her story is to be believed, she refused his attendance. At least primarily, the purpose of examination was neither surgical nor medical treatment. It was forced upon her for other reasons. The ground of exemption in the cases above cited is made to rest upon the

voluntary assumption by the passenger of such relation. As the court said in O'Brien v. S. S. Co., supra; it is optional entirely with the passengers, whether or not they employ the physician. They may use his medicines or not, as they choose. They may place themselves under his care or go without attendance as they prefer, and they determine themselves how far and to what extent they will submit to his control and treatment. The captain of the ship cannot interfere. If there may be cases of emergency, when the sufferer is unconscious, and when action is necessary before consent can be obtained, this is not such a case.

Neither is defendant immune from liability for the acts of the ship's surgeon by reason of the provisions of the act of Congress, familiarly known as the United States Immigration Act. "An act to regulate the immigration of aliens into the United States," passed February 20, 1907 (34 Stat. 909, c. 1134), as amended March 26, 1910 (36 Stat. 263, c. 128). Section 2 (U. S. Comp. St. 1913, § 4244) of said act provides for the exclusion from admission into the United States, among others, of "persons likely to become a public charge." Section 12 of the same act (U. S. Comp. St. 1913, § 4258) makes it the duty of the master, upon the arrival of aliens at any port, to deliver to the immigration officers lists made "at the time and place of embarkation" of aliens transported; and by section 13 (U. S. Comp. St. 1913, § 4260) of the same act it is provided that aliens arriving by water at ports of the United States shall be listed in convenient groups, and that each list shall be verified by the master to the effect that he has caused the ship's surgeon "to make a physical and oral examination of each of such aliens," and that such alien is not "likely to become a public charge." Whether such examination is to be made at the port of embarkation or whether at the port of arrival, and within the territorial jurisdiction included within the act of Congress above referred to, we need not now determine. This was made at neither place. More than that, there is no evidence that, if plaintiff had been the mother of the child, it was illegitimate, or, if illegitimate, that either mother or child was likely to become a public charge. It is true that there was evidence that "as a rule" a woman who has given birth to an illegitimate child on a vessel was excluded as a person likely to become a public charge, but there is no evidence in this case whether plaintiff, if such a mother, came within the general rule, or the not infrequent exception. Giving birth to illegitimate children is not necessarily confined to women of the class less favored financially. We think, therefore, that the learned trial court was entirely right when he instructed the jury that the ship's surgeon had no "right against the will of this plaintiff to violate her person and examine her physically other than he could do by mere visual examination"; and, while he had "the right to interrogate her to get such answers as she gave," he had "no right to use physical force in order to ascertain her physical condition."

There remains, then, for consideration, assuming the truth of plaintiff's story, the measure of damages for breach of the contract of transportation. The learned court at Trial Term charged the jury that, if examined against her will, the plaintiff was entitled to "such an amount as would compensate her for her pain and suffering, for the humiliation and injury to her feelings, and injury to her health," and again that "she would be entitled to recover for the physical injuries such as you find them to be, and the results which you find have flowed from it, and for her humiliation and injury to her feelings." To this instruction defendant duly excepted. No reference whatever was made in the charge to damages based upon the sum paid for transportation. The amount of the verdict compels the conclusion that the jury must not only have accepted plaintiff's version of the occurrences, but have considered the various tortious acts testified to by her as committed by defendant's servants. The learned counsel for respondent concedes this, for, in his estimate of the elements of damage, he enumerates slander, false imprisonment, insulting and degrading language, exclusive of actual words of slander, five assaults or forcible examinations of her person, and one examination unaccompanied by assault. If this contract was one made within and controlled by the laws of this state, we are not prepared to say that the rule given by the learned trial court was incorrect. Gillespie v. Brooklyn Heights R. R. Co., 178 N. Y. 347, 70 N. E. 857, 66 L. R. A. 618, 102 Am.

154 N.Y.S.—3

St. Rep. 503; Busch v. Interborough R. T. Co., 187 N. Y. 388, 80 N. E. 197, 10 Ann. Cas. 460; De Wolf v. Ford, 193 N. Y. 397, 86 N. E. 527, 21 L. R. A. (N. S.) 860, 127 Am. St. Rep. 969; Aaron v. Ward, 203 N. Y. 351, 96 N. E. 736, 38 L. R. A. (N. S.) 204. But this is not such an action. It is not even an action in which damages are claimed for breach of the contract of carriage, and also for what Judge Martin, in his opinion in Gillespie v. Brooklyn Heights R. R. Co., supra, refers to as the duty of a carrier to its passenger "in the absence of any contract whatsoever." Wisely or unwisely, counsel for plaintiff, in resisting the motion for a separate statement of plaintiff's causes of action, limited her to the former action only.

We are therefore compelled to consider what the English law is, respecting the measure of damages for breach of a contract of carriage. "The unwritten or common law of another state, or of a territory, or of a foreign country, may be proved, as a fact, by oral evidence. The books of reports of cases, adjudged in the courts thereof, must also be admitted, as presumptive evidence of the unwritten or common law thereof." Code of Civil Procedure, § 942. In the case at bar defendant presented, as an expert, a barrister called to the bar in England in 1877, and ever since then engaged in active practice in British possessions. At the present time, he is thus engaged in Toronto, in the province of Ontario, where the common law is the same as that of England. He is also engaged at the University of Toronto as a lecturer on the history of English law and general jurisprudence and Roman law. He was asked as to the rule in that jurisdiction with respect to the measure of damages, where there has been a breach of a contract of carriage. He replied that, under a recent decision of the House of Lords in the case of Addis v. Gramophone Co., Limited, Law Reports, 1909, Appeal Cases, 488, it was decisively settled that one cannot, in an action for breach of such a contract, obtain damages for injured feelings, ignominy, obloquy, and damage of that character. The opinion in that case was then offered and received in evidence. The witness further testified that some confusion had arisen in some of the earlier reported cases, because the action had been brought, not only for damages for breach of the contract of carriage, but for breach of a duty independent of the contract, and that, based upon authorities to which he referred, in case of an action for breach of the contract of carriage, injuries received by way of assault or physical ill treatment by a servant of a steamship company would not be the reasonable and natural consequence of a breach of such contract and could not be recovered. The cases to which he referred were Hadley v. Baxendale, 9 Exchequer, 341, 345; Hobbs v. London & Southwestern Ry. Co., 10 Q. B. 111–123, 124; McMahon v. Field, 7 Q. B. 591; Taylor v. Manchester, Sheffield & Lincolnshire R. Co., 1 Q. B. Div. (1895) 134; Kelly v. Metropolitan Ry. Co., 1 Q. B. Div. (1895) 944. The opinion in neither of these cases was offered in evidence. Plaintiff then called in rebuttal a gentleman residing in the city of New York, likewise admitted to practice as a barrister at King's Inn in 1897. For three years he had practiced before the English courts. Since then he had not practiced there, but had resided and practiced in this country. He testified that, in the case of a breach of a contract of carriage resulting from a malfeasance (and he termed abuse, maltreatment, and assault of a passenger by employés of a common carrier malfeasance), the damages "necessarily flowing from the conduct of the breach will be recovered." He then summarized the rule of damages as follows: "A common carrier is liable in damages to a passenger for an injury to his feelings caused by the insulting language of its employés, upon the ground of a breach of its contract, which obligates it not only to transport the passenger, but to accord to him respectful and courteous treatment, and to protect him from insults from strangers and its own employés. Among the elements of damages in such a case, and which may be considered in determining their amounts, are the humiliation and injury to his feelings suffered by him, not, however, including any injury to his character resulting therefrom, and he is entitled to recover compensatory damages only, not including punitive or exemplary damages." It will be observed that this rule is identically the same as that stated in the headnote to the case of Gillespie v. Brooklyn Heights R. R. Co., supra, by our own Court of Appeals. In support of his opinion, he cited

the case of Hobbs v. London & S. W. Ry. Co., supra, cited by the expert called by the defendant. He admitted upon cross-examination that he had never heard of Addis v. Gramophone Co., supra. Upon this conflicting evidence, the first question for our determination is whether the question of fact as to the foreign law was one for the jury or for the court. In this instance, the learned trial court determined that the question was one for its determination, and the trial judge instructed the jury in accordance with the rule of our own Court of Appeals, as laid down in the Gillespie Case. In Kline v. Baker, 99 Mass. 253, the Supreme Court of Massachusetts, speaking through Gray, J., said: "When the evidence consists of the parol testimony of experts as to the existence or prevailing construction of a statute, or as to any point of unwritten law, the jury must determine what the foreign law is, as in the case of any controverted fact depending upon like testimony." And in Ufford v. Spaulding, 156 Mass. 65, 30 N. E. 360, the court said: "It is a general rule that laws of other states must be proved as facts, and ordinarily, in a trial by jury, the question must be left to the jury to decide as a fact what the law of another state is, if it becomes material to be determined. This may in some cases prove inconvenient in practice, especially in view of the provision of our statute that the court shall not charge juries with respect to matters of fact; but such is the established rule in this commonwealth."

Argument is unnecessary to support the contention that, as to the unwritten law, the same rule must apply to foreign countries, where the English common law prevails, as to the various states comprised within the nation. If this is a correct statement of the law without qualification, then the learned trial justice erred in his instructions to the jury, for the question was not left to it for determination as a question of fact, but, as we have pointed out, he advised the jury what the foreign law is. It is difficult to conceive of a more unworkable rule in the conduct of trials than the one stated. But, if this is the general rule, there is a well-recognized exception thereto which seems to us to be here applicable. In Ufford v. Spaulding, supra, it is thus stated: "To this rule there is an exception where the evidence which is given of the law of another state consists of a statute or judicial opinion or document. In such case, the construction of such evidence is for the court." And again the highest court of our own state has thus stated the exception: "Although what the foreign law is is usually denominated a question of fact, yet, when it merely involves the construction of a written statute or the interpretation of judicial opinions, it becomes a question of law. * * * That when it becomes necessary to establish the law of a foreign country it must be proved as facts are proved, there is no doubt; but when, after such proof is given, the questions involved depend upon the construction and effect of a statute or judicial opinion, we think those questions are for the court and not questions of fact at all." Bank of China v. Morse, 168 N. Y. 458, 470, 61 N. E. 774, 56 L. R. A. 139, 85 Am. St. Rep. 676. The rule, thus enunciated in 1907, does not appear to have been since questioned in any reported case within this state that we have been able to discover. In the case at bar, the opinion in the case of Addis v. Gramophone Co., supra, is the only one that was actually marked in evidence; but the opinions in five other cases were referred to in the testimony of defendant's expert, the volume and page of the reported case being stated. One of these was also referred to in the testimony of plaintiff's expert, and it was the only case referred to by him. These were given as the basis of the respective conclusions drawn by them. When the opinion in the Addis Case was offered in evidence by defendant's counsel, the learned counsel for plaintiff objected to its receipt in evidence, and this occurred: "The Court: I do not understand why he cannot offer the opinion. It is not evidence that the jury is going to consider. This is evidence that I am going to consider in delivering my charge; that is all. So I do not see why the opinion is not competent. It may be proved as a fact by oral evidence. Do you object to the opinion as a matter of information for the court?" Plaintiff's counsel replied in the negative, and he thereupon withdrew his objection. Thereafter not only were the contents of the opinions of each of the six cases referred to without objection by either counsel in the course of the ex-

amination of the expert witnesses, but no request was thereafter made by either counsel to submit to the jury as a disputed question of fact the inferences to be drawn from them.

We think, therefore, that it must be deemed that counsel conceded that the law of England was contained within these six opinions; and, as there was no dispute of fact that these were judicial opinions rendered at the time and by the courts named in the reports, the construction of these opinions was "for the court and not questions of fact at all." Bank of China v. Morse, supra.

It follows that we must examine them, and determine if the correct rule of English law, as to the measure of damages in an action for breach of the contract of carriage, was given to the jury by the learned trial court. The first of these cases was Hadley v. Baxendale, 9 Exchequer, 341, decided in 1854. Defendants in that case were common carriers. Plaintiffs were millers. The crank shaft of the engine in their mill was broken. It was delivered to defendants for transportation to a firm at Greenwich, as a pattern for the construction of a new shaft. The broken shaft was to be delivered to them within two days, which was a reasonable time. It was not delivered for seven days. Upon a separate count alleging the breach of the contract, plaintiff's inability to operate their mill in the interval covered by such delay, and damages resulting from loss of wages and inability to mill and sell their products, the jury, at the Gloucester Assizes, found a verdict for plaintiffs for 50 pounds. The Court of Exchequer reversed this judgment, and thus stated the rule: "Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally (i. e., according to the usual course of things) from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it."

The next case was Hobbs v. L. & S. W. Ry. Co., L. R., 10 Queen's Bench, 111, decided by the Court of Appeal in 1875. Plaintiff purchased tickets for himself and wife for transportation from Wimbledon to Hampton Court. The train which they took, instead of passing over the branch leading to Hampton Court, went over another branch of the road, and they were compelled to alight at Esher, between four and five miles from their intended destination. They were unable either to obtain accommodations for the night there, or a conveyance to transport them to Hampton Court. They were obliged to walk. The night was wet and cold, and plaintiff's wife contracted a severe cold. For this it was held, in an action for breach of a contract, that plaintiff could not recover. Chief Justice Cockburn, in his opinion, said: "That, to entitle a person to damages by reason of a breach of contract, the injury for which compensation is asked should be one that may be fairly taken to have been contemplated by the parties as the possible result of the breach of contract. Therefore you must have something immediately flowing out of the breach of contract complained of, something immediately connected with it, and not merely connected with it through a series of causes intervening between the immediate consequence of the breach of contract and the damage or injury complained of." Mellor, J., said: "The damage, which, as a matter of law, must be considered as the measure of damages, is such as arises naturally and directly from the breach of contract, or such as both parties might reasonably have expected to result from a breach of the contract." Blackburn, J., in his opinion, cites with approval the case of Burton v. Pinkerton, L. R., 2 Ex. 340, where a passenger upon a train was left at the wrong station. Although one of the claims of plaintiff was that he was entitled to damages for "being imprisoned there" for a considerable period, the majority of the court thought that he could not recover for this in such an action. In the case at bar, concededly, one of the elements constituting plaintiff's damage was her alleged imprisonment in the ship's hospital. The case of McMahon v. Field, L. R., 7 Queen's Bench, 591, decided by the Court of Appeal in 1881, questioned the correctness of the decision in the case of Hobbs v. L. & S. W. Ry. Co., supra. This action was not for damages for breach of a contract of transportation, but for

breach of a contract for stabling plaintiff's horses. If it may be conceded that the strict rule laid down in Hadley v. Baxendale and Hobbs v. L. & S. W. Ry. Co. was thereby somewhat relaxed, in the case of Addis v. Gramophone Co. the House of Lords re-established such general rule in its original force. In the cases of Taylor v. Manchester, S., & L. Ry. Co., L. R., 1 Q. B. Div. 134, decided in January, 1895, and Kelly v. Metropolitan Ry. Co., L. R., 1 Q. B. Div. 944, decided in April, 1895, the Court of Appeal stated a rule with respect to damages for breach of a contract of carriage still more at variance with the rule of our own courts, as stated in the cases of Gillespie v. Brooklyn Heights R. R. Co., supra, and Busch v. Interborough Rapid Transit Co., supra. That was that even when there was a contract of carriage, for acts either of affirmative misfeasance or of culpable negligence by the servants of the common carrier, the action was not for breach of the contract of carriage, but sounded in tort.

In the Taylor Case, plaintiff was a passenger. A porter shut the door of the compartment upon his thumb, crushing it. The question considered was whether his action was one for breach of contract of safe carriage or arising upon tort. The court said: "That which caused the injury was not an act of omission. It was not a mere nonfeasance. It was not merely the not taking such care of the plaintiff as by the contract the defendants were bound to take. But it was an act of misfeasance; it was positive negligence in jamming his hand. Contract or no contract, he could maintain an action for that. All that the plaintiff would have to prove in such a case would be that he was lawfully on the premises of the railway company, and the contract is merely a part of the history of the case." The court held his action to be one in tort.

In Kelly v. Metropolitan Ry. Co., supra, the court went one step further and held that, for acts either for misfeasance or nonfeasance of defendant's servants, the action was not for breach of the contract of safe carriage, but in tort. The action was brought by a railroad passenger against the company for personal injuries caused by the negligence of the servants of the company, while he was traveling on their line, in running the train into a stone wall. The court considered whether the action was founded in tort when the negligence charged is an omission on the part of the servant to do some act that he should have done, and not the commission by the servant of some act amounting to a misfeasance. Lord Esher, Master of the Rolls, in discussing the question, referred to the old contest whether his action was for breach of contract to carry him with reasonable care and skill, or, disregarding the contract, the carrier was bound not to injure him by any negligence on its part, which latter would be an action in tort, and said that it had been finally settled to be in tort in either case.

Finally, in Addis v. Gramophone Co., Law Reports (9 Edw. vii) Appeal Cases, 488, the House of Lords in 1909 reaffirmed the rule that in an action for breach of a contract, which in this case was one of hiring, plaintiff may not recover, among other things, for injured feelings arising from the manner of his dismissal or for the loss he may have sustained from the fact that the dismissal, of itself, makes it more difficult for him to obtain fresh employment. In that case Lord James Hereford said: "When I was a junior at the bar, when I was drawing pleadings, I often strove to convert a breach of contract into a tort in order to recover a higher scale of damages; it having been then as it is now, I believe, the general impression of the profession that such damages cannot be recovered in an action of contract as distinguished from tort, and therefore it was useless to attempt to recover them in such a case. That view, which I was taught early to understand was the law in olden days, remains true to this day."

We think, then, this to be the present English law relative to the respective rights of common carriers and passengers: For breach of the contract of safe carriage, the latter has an action against the former, in which the measure of damages is such as may fairly and reasonably be considered either arising naturally (i. e., according to the usual course of things from such breach of contract itself), or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. If, in connection with

the breach of the contract of safe carriage, tortious acts have been committed by defendant's servants, either of misfeasance or nonfeasance, the remedy for that is not an action for breach of the contract, but one sounding in tort. It is true that in the case of Kelly v. Metropolitan Ry. Co., supra, Lord Esher said: "At the present time a plaintiff may frame his claim in either way, but he is not bound by the pleadings; and if he puts his claim on one ground, and proves it on another, he is not now embarrassed by any rules as to departure." If this rule of English procedure is not qualified by the later decision of the House of Lords in Addis v. Gramophone Co., supra, it cannot aid plaintiff in the case at bar. As to procedure, the lex fori, not the lex loci contractus, governs. The English rule as to the form of the pleadings is one of practice, not of property, of remedy, not of right (Lodge v. Phelps, 1 Johns. Cas. 139; Gleason v. Northwestern M. L. Ins. Co., 203 N. Y. 507, 516, 97 N. E. 35), and is contrary to our own. Our Code of Civil Procedure requires that the facts constituting the cause of action shall be plainly and concisely stated (Code of Civ. Proc. § 481), and that, when two or more causes of action are contained therein, each cause of action must be separately stated and numbered (Code of Civ. Proc. § 483). The distinction between causes of action in tort and in contract are still recognized; and, while substantially the same state of facts may support the one or the other (Busch v. Interborough R. T. Co., supra), the form of pleading is essentially different. When the English law says for breach of contract of safe carriage plaintiff may recover, and defendant shall be liable for one sum, and for tortious acts committed by the carrier's servants in performing said contract, the recovery and the liability shall be measured according to a totally different standard, this affects the right and not the remedy. And when, as in this case, defendant seeks to obtain a separate statement of the cause of action for breach of this English contract of carriage and of the several causes of action arising from the tortious acts of defendant's servants in connection therewith, and this claim is successfully resisted upon the ground that plaintiff seeks only damages for breach of the contract of carriage, there is no escape from the conclusion that she elects to accept such damages as under the English law flows from the breach of the contract of carriage alone. Perhaps it would have been wiser not to have resisted defendant's demand. It may not be too late, by appropriate motion and an amended complaint, to remedy this. Whether a cause of action for breach of the contract may be joined with several causes of action arising out of slander, false imprisonment, assault, and insult causing humiliation, we need not now decide. See Bradbury's Rules of Pleading, 162; Keep v. Kaufman, 56 N. Y. 332; Thomas v. Utica & Black River R. R. Co., 97 N. Y. 245; Edison El. Ill. Co. v. Kalbfleisch Co., 127 App. Div. 298, 111 N. Y. Supp. 462.

As it is, the present judgment cannot stand, and it and the order denying the motion for a new trial must be reversed, and a new trial granted.